**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9

10   MOHAMMED HAROON ALI,

11              Petitioner,                    No. C 05-5243 PJH

12        v.                                   **ORDER DENYING PETITION FOR**
                                               **WRIT OF HABEAS CORPUS**
13   RODERICK Q. HICKMAN, Director,
     California Department of Corrections,
14
                Respondent.
15   _____/

16        Before the court is the petition for writ of habeas corpus filed by state prisoner,

17   Mohammed Haroon Ali ("Ali") pursuant to 28 U.S.C. § 2254.  Having reviewed the parties'

18   papers, the record, and having carefully considered their arguments and relevant legal

19   authorities, the court DENIES the petition.

20                                **BACKGROUND**

21   **I.    Procedural History**

22        In 2001, a jury convicted Ali of first-degree murder in the San Mateo County

23   Superior Court.  Ali had two prior felony convictions, and at the time of his murder

24   conviction, he was on probation for aggravated kidnapping.

25        At a hearing on May 5, 2001, the trial court found the allegations regarding his prior

26   offenses to be true, that one of them constituted a "strike," and that Ali had violated his

27   probation.   On August 13, 2001, the trial court sentenced Ali to an aggregate sentence of

28   fifty-five years to life in prison.  In addition, the trial court revoked Ali's probation and

**United States District Court**
For the Northern District of California

1    reimposed the nine-year sentence from his prior aggravated kidnapping conviction.

2         The California Court of Appeal denied Ali's direct appeal and his petition for state

3    habeas relief on January 30, 2004.  The California Supreme Court then denied review on

4    May 12, 2004, and denied his habeas petition on January 19, 2005.  Ali filed the instant

5    federal habeas petition on December 19, 2005.

6    **II.    Factual History**

7         Ali's conviction arose from the following facts.  A more extensive summary may

8    be found in the state appellate court's January 30, 2004 decision.  See Record Exh. 11.

9         Ali and the victim, Tracey Biletnikoff ("Tracey" or "Biletnikoff"), dated in late 1998 and

10   early 1999.  Both had histories of drug abuse.  Ali had successfully completed a drug

11   rehabilitation program at Project 90 in San Mateo, California, and was an adolescent

12   counselor at Project 90 beginning in January 1999.

13        Two days prior to Biletnikoff's murder, Ali had relapsed and spent a night binging on

14   alcohol and crack cocaine.  On Monday, February 13, 1999, the day of the murder, Ali

15   confessed his relapse to Tracey and others at Project 90.  However, the evidence

16   suggested that he was not under the influence of drugs or alcohol at that time.

17        Trial witnesses had different perspectives on the couple's relationship, but several

18   testified that Biletnikoff was ambivalent about her relationship with Ali and intended to end

19   it.  About three weeks before her death, Biletnikoff told her stepmother she was "tired of

20   being the caregiver" and tired of Ali's threats  to go back on drugs if she left him.  On the

21   day she was killed, Biletnikoff told her best friend that she was breaking up with Ali that

22   day.  However, there was also evidence that the couple had consensual sex within 72

23   hours of the homicide, and Tracey and Ali were seen touching affectionately hours before

24   her death.

25        As a result of his relapse, Ali faced severe consequences.  He would lose his

26   position as adolescent counselor and would need to restart the rehabilitation program in

27   order to remain at Project 90.  Additionally, he was on probation for prior offenses and was

28   scheduled for a drug test the next day; if he failed the drug test, then his nine-year prison

**United States District Court**
For the Northern District of California

1   sentence could be reinstated.  Ali, an East Indian citizen of Fiji, was also facing deportation

2   proceedings related to his prior conviction.

3          At 5:00 p.m. on February 13, 1999, Biletnikoff left Ali at Project 90 to attend her own

4   recovery meeting.  Soon after, Ali went to a bus stop, where one of the Project 90

5   counselors found him and convinced him to attend a recovery meeting.  Biletnikoff returned

6   to Project 90 at 8:00 p.m.  Witnesses testified that Biletnikoff was worried about Ali and his

7   demands to use her car, and friends advised her not to lend him the car.  Biletnikoff went to

8   talk to Ali in his office while others attended a meeting.  During Ali's subsequent confession

9   to the police, he stated that he and Biletnikoff began to argue, which escalated into a

10  physical confrontation.  Tracey allegedly blocked Ali's exit from the office and hit him.  She

11  also called him a "loser" and compared him to her ex-boyfriend, who had relapsed and

12  never recovered.  Ali grabbed Tracey by the neck and strangled her with his hands until

13  she fell to the ground, at which point "white stuff" came from her mouth.  He then choked

14  her with his T-shirt.  Forensic evidence indicated that Biletnikoff was still alive when Ali

15  began to strangle her with his T-shirt.  Biletnikoff's body also showed other signs of

16  violence.  Her face was bruised and scraped in multiple areas around her forehead, nose,

17  and mouth from the application of blunt force.

18         After killing Tracey, Ali drove one of the Project 90 vans to the back door of his office

19  and loaded her body into the front seat.  He first drove home, where he changed his

20  clothes and talked to his nephew.  Family members testified that they saw no visible signs

21  that Ali had been in a fight.  Ali confessed to his nephew that he had killed Tracey, although

22  Ali told him initially that he had accidentally killed her by a blow to the face with his elbow.

23  Ali also told his nephew he did not want to go to back to jail and asked him for money.  Ali

24  then drove Tracey's body to Cañada College in Redwood City, California, where he rolled

25  her body down a steep hillside.  Ali returned to Project 90 and fled in

26  Tracey's car to Mexico.

27         Ali was apprehended the following night, when he crossed the border from Mexico

28  back into California.  While in police custody, Ali confessed to killing Tracey Biletnikoff, but

United States District Court

For the Northern District of California

gave inconsistent accounts as to how he gained possession of Biletnikoff's car keys. He first asserted that he grabbed them from her during their confrontation, but then claimed that he searched her clothing for the keys after she had died.

At trial, the prosecution introduced evidence of Ali's 1994 conviction for the kidnapping of his then-girlfriend, Daisy Chandra. Chandra testified that Ali had kidnapped her, threatened to kill her, and accosted her at knife point in the past.

### ISSUES

Ali raises the following claims for relief in his federal habeas petition:

1)  that his constitutional rights were violated by the prosecutor's racially discriminatory use of peremptory challenges;

2)  that the trial court's manslaughter jury instruction violated his due process and fair trial rights;

3)  that trial counsel was ineffective in failing to object to the trial court's manslaughter jury instruction and the prosecution's related closing argument;

4)  that the introduction of propensity evidence violated his due process and fair trial rights; and

5)  that the propensity evidence jury instruction given by the trial court violated his due process rights.[1]

### STANDARD OF REVIEW

The petition in this case was filed after the effective date of the Antiterrorism and

_____

[1] In his petition, Ali appears to have mistakenly framed this last claim as an issue of ineffective assistance of counsel. *See* Petition at 24 ("The judgment of commitment rendered against the Petitioner is invalid, and his consequent detention is unlawful, because *he was deprived of effective assistance of counsel guaranteed him by the Fifth, Sixth, and Fourteenth Amendments* . . . because the pattern jury instructions regarding the use of propensity evidence permitted the jury to convict Petitioner of the charged crime even if the prosecution failed to prove Petitioner's guilt 'beyond a reasonable doubt.'"). However, the claim that Ali presented to the state appellate court, that the State has addressed in its opposition, and that Ali has replied to in his traverse, is actually a due process claim. *See* Exh. 12 at 30 (arguing in petition for review to California Supreme Court that the trial court's instruction pursuant to CALJIC 2.50.02 violated Ali's due process rights); Oppos. at 32-33; Traverse at 63. Accordingly, this court will address the claim as one based on a due process violation as opposed to a denial of effective assistance of counsel, as originally stated in Ali's habeas petition filed with this court.

United States District Court

For the Northern District of California

1   Effective Death Penalty Act of 1996 (AEDPA), so the provisions of that act apply.  See

2   Lindh v. Murphy, 521 U.S. 320, 327 (1997).  Under AEDPA, a district court may not grant a

3   petition challenging a state conviction or sentence on the basis of a claim that was

4   reviewed on the merits in state court unless the state court's adjudication of the claim: (1)

5   resulted in a decision that was contrary to, or involved an unreasonable application of

6   clearly established federal law, as determined by the Supreme Court of the United States;

7   or (2) resulted in a decision that was based on an unreasonable determination of the facts

8   in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

9        A state court decision is "contrary to" Supreme Court authority, and therefore falls

10  under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion

11  opposite that reached by the [Supreme] Court on a question of law, or if the state court

12  decided a case differently than the [Supreme Court] has on a set of materially

13  indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412 (2000).  "Clearly

14  established federal law" under § 2254(d)(1) is the governing legal principle or principles set

15  forth by the Supreme Court at the time the state court renders its decision.  Lockyer v.

16  Andrade, 538 U.S. 63, 75 (2003).  This "clearly established" law refers to the holdings, as

17  opposed to the dicta, of [Supreme] Court decisions as of the time of the relevant state court

18  decision.  Id.

19       Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court

20  may grant the writ if the state court identifies the correct governing principle from the

21  [Supreme] Court's decisions but unreasonably applies that principle to the facts of the

22  prisoner's case.  Id. at 74.  However, this standard requires the state court decision to be

23  more than incorrect or erroneous.  Id.  For the federal court to grant habeas relief, the state

24  court's application of the Supreme Court authority must be objectively unreasonable.  Id. at

25  74.  The "objectively unreasonable" standard is different from the "clear error" standard in

26  that "the gloss of clear error fails to give proper deference to state courts by conflating error

27  (even clear error) with unreasonableness."  Id. at 75; see Clark v. Murphy, 331 F.3d 1062,

28  1068 (9th Cir. 2003).  Therefore, it is not enough that a habeas court, in its independent

5

United States District Court

For the Northern District of California

1   review of the legal question, is left with a firm conviction that the state court was erroneous.

2   Rather, the habeas court must conclude that the state court's application of federal law was

3   objectively unreasonable.  Andrade, 538 U.S. at 75; Clark, 331 F.3d at 1068.

4          However, when the state court decision does not articulate the rationale for its

5   determination or does not analyze the claim under federal constitutional law, a review of the

6   court's application of clearly established federal law is not possible.  See Delgado v. Lewis,

7   223 F.3d 976, 981 (9th Cir. 2000); see also 2 J. Liebman & R. Hertz, Federal Habeas

8   Corpus Practice and Procedure § 32.2 at 1424-26 & nn. 7-10 (4th ed. 2001). When

9   confronted with such a decision, a federal court must conduct an independent review of the

10  record and the relevant federal law to determine whether the state court's decision was

11  "contrary to, or involved an unreasonable application of" clearly established federal law.

12  Delgado, 223 F.3d at 981.

> When a state court does not furnish a basis for its reasoning, we have no
> basis other than the record for knowing whether the state court correctly
> identified the governing legal principle or was extending the principle into a
> new context . . . [A]lthough we cannot undertake our review by analyzing the
> basis for the state court's decision, we can view it through the 'objectively
> reasonable' lens ground by Williams [v. Taylor, 529 U.S. 362 (2000)] . . .
> Federal habeas review is not de novo when the state court does not supply
> reasoning for its decision, but an independent review of the record is required
> to determine whether the state court clearly erred in its application of
> controlling federal law . . . Only by that examination may we determine
> whether the state court's decision was objectively reasonable.

19  Delgado, 223 F.3d at 981.

20         As for state court findings of fact, under § 2254(d)(2), a federal court may not grant a

21  habeas petition by a state prisoner unless the adjudication of a claim on the merits by a

22  state court resulted in a decision that was based on an unreasonable determination of the

23  facts in light of the evidence presented in the state court proceeding.  28 U.S.C.

24  § 2254(d)(2).  The "clearly erroneous" standard of unreasonableness that applies in

25  determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in

26  determining the "unreasonable determination of the facts in light of the evidence" under §

27  2254(d)(2).  See Torres v. Prunty, 223 F.3d 1103, 1107 (9th Cir. 2000).  To grant relief

28  under § 2254(d)(2), a federal court must be "left with a firm conviction that the

**United States District Court**
For the Northern District of California

1  determination made by the state court was wrong and that the one [petitioner] urges was

2  correct." Id. at 1108.

3  **DISCUSSION**

4  **I.    Ali's Constitutional Rights Were Not Violated by the Prosecution's Use of Peremptory Challenges**

6  Ali claims that the prosecution exercised peremptory challenges to strike two jurors

7  on the basis of race, in violation of Batson v. Kentucky, 476 U.S. 79 (1986).[2]

8  **A.    Legal Framework for Batson Challenges**

9

10  The use of peremptory challenges by either the prosecution or defendant to exclude

11  cognizable groups from a jury may violate the Equal Protection Clause.  See Georgia v.

12  McCollum, 505 U.S. 42, 55-56 (1992). The Supreme Court first held that the Equal

13  Protection Clause forbids the challenge of potential jurors solely on account of their race in

14  Batson, 476 U.S. at 89.

15  Batson permits prompt rulings on objections to peremptory challenges under a

16  three-step process.  Id.  First, the defendant must make a prima facie case that the

17  prosecutor exercised peremptory challenges on the basis of race "by showing that the

18  totality of the relevant facts gives rise to an inference of discriminatory purpose."  Id. at 93-

19  94.  A party establishes a prima facie case by showing that: (1) the defendant is a member

20  of a cognizable racial group, (2) the group's members have been excluded from the jury,

21  and (3) the circumstances of the case raise an inference that the exclusion was based on

22  race.  Id. at 96.  A defendant will satisfy the requirements of Batson's first step by

23  _____

24  [2]In his petition, Ali initially asserts that the prosecutor's use of peremptory challenges against two African-American jurors deprived him "of a fair jury trial, due process, and the equal protection of laws guaranteed by the Fifth, Sixth and Fourteenth Amendments to the

25  United States Constitution."  However, in his briefing of the issue before this court, and in his state appellate court briefs and petition for review, he raised the issue solely as a violation of

26  the Equal Protection Clause under Batson.  Because Ali has not exhausted this claim to the extent it is based on an alleged violation of his Sixth Amendment right to a fair and impartial

27  jury, or his Fifth and Fourteenth Amendment due process rights, nor has he briefed the issue before this court as such, this court limits its review of the issue as an alleged violation of the

28  Equal Protection Clause under Batson.

United States District Court

For the Northern District of California

1  producing evidence sufficient to permit the trial judge to draw an inference that

2  discrimination has occurred.  Johnson v. California, 545 U.S. 162, 170 (2005).

3      Second, if a prima facie case is made, the burden shifts to the prosecutor to

4  articulate a race-neutral explanation for striking the jurors in question.  Batson, 476 U.S. at

5  97; Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000).  "[T]he prosecutor must give a

6  'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the

7  challenges."  Batson, 476 U.S. at 98 n. 20.   Reasons must be "related to the particular case

8  to be tried."  Id. at 98.  The prosecutor's explanation need not be persuasive; unless a

9  discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be

10  deemed race-neutral.  See Purkett v. Elem, 514 U.S. 765, 768-69 (1995).

11      Third and finally, the trial court must determine whether the defendant has carried

12  his burden of proving purposeful discrimination.  Batson, 476 U.S. at 98; Wade, 202 F.3d at

13  1195.  To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and

14  credibility under the totality of the relevant facts, using all the available tools, including its

15  own observations and the assistance of counsel.  Mitleider v. Hall, 391 F.3d 1039, 1047

16  (9th Cir. 2004); Lewis v. Lewis, 321 F.3d 824, 831 (9th Cir. 2003).  Comparative juror

17  analysis, discussed in more detail below, involves determining whether non-challenged

18  jurors possess any of the characteristics on which the prosecution challenged jurors in the

19  protected group, and may tend to prove discrimination at the third Batson step.  Miller-El v.

20  Dretke, 545 U.S. 231,  242-43 (2005); Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir.

21  2006); Sims v. Brown, 425 F.3d 560, 577 (9th Cir.), amended, 430 F.3d 1220 (9th Cir.

22  2005); United States v. You, 382 F.3d 958, 968-69 (9th Cir. 2004).

23      **B.     Factual Background**

24      During trial, Ali's counsel made a Batson/Wheeler motion when the prosecutor used

25  his peremptory challenges to strike the only two African-American jurors in the venire,

26  Marcelline Combs and Darrell Jefferson.  Batson, 476 U.S. at 89; see also People v.

27  Wheeler, 22 Cal.3d 258 (1978).  The trial court found a prima facie case of discrimination,

28

United States District Court
For the Northern District of California

1    and required the prosecutor to set forth his reasons for excusing the two jurors.  Batson,

2    476 U.S. at 89.

3        The prosecutor first explained that he excused Combs based on her equivocal

4    statements regarding an incident of molestation in her family.  Augmentation to Reporter's

5    Transcript ("ART") at 790, People v. Ali, San Mateo County Super. Ct. (No. SCO46199A);

6    see also Exh. 4.  Combs had indicated on her jury questionnaire that her stepson had

7    attempted to molest her daughter.  ART 250.  Her stepson was subsequently arrested and

8    taken to juvenile hall, and eventually placed on probation.  ART 251-52.  The prosecutor

9    specifically took issue with Combs' response to a question regarding whether the attempted

10   molestation would have any ramifications on the case at hand.  Combs responded that she

11   "really [didn't] think – I don't think it would have any bearing.  I don't know.  I don't think it

12   would."  ART 252.  Additionally, the prosecutor also expressed concern about Combs'

13   involvement in the criminal justice system as a result of the molestation incident. [3]

14       Second, the prosecutor explained that he excused Combs because she had

15   indicated that the demeanor and professionalism of the attorneys would affect her opinion

16   of the trial.  During voir dire, the prosecutor asked Combs about her impressions of

17   attorneys and what she believed they would be willing to do for their clients.  ART 398.  In

18   her response, Combs stated that she hoped the attorneys would act professionally.  ART

19   398.  She also stated that she would not penalize the attorneys if they had to engage in

20   aggressive questioning of a witness as long as they kept it professional and respectful.

21   ART 398.

22       Finally, the prosecutor asserted that Combs' Christian faith might interfere with her

23   ability to judge Ali.  Combs had indicated on her juror questionnaire that she regularly

24   attended church.  Also, during voir dire, when defense counsel inquired about the effect of

25

26   —————————————

27       [3] Regarding his concern with Combs' experience with the criminal justice system, the
     prosecutor stated: "It did involve family members within the system.  That was, level one, a
28   concern I had."  ART 790.

United States District Court
For the Northern District of California

her spiritual practice on the present case, Combs took a moment to think before answering

that it would not affect her ability as a juror.  ART 400.  However, when questioned about

her initial hesitancy, Combs stated there was a distinction between judging in the position

of a juror and judging as a Christian, and then confirmed that her religion would not affect

her ability to be objective as a juror.  ART 400.

The prosecutor then offered four reasons for challenging the other juror at issue,

Darrell Jefferson.  First, he was concerned that Jefferson would "over-intellectualize" the

case, and the prosecutor was looking for jurors who could keep an open mind until the

close of the evidence.  ART 792.  The prosecutor based this concern on Jefferson's

statement during voir dire that people constantly make decisions and then reassess them

as new information becomes available.  ART 676.  Secondly, the prosecutor felt that one of

Jefferson's responses had been a "smart-ass answer," which he found offensive.  ART 792.

This was based on an exchange he had with Jefferson in which one of Jefferson's answers

drew laughter from the courtroom.  Third, the prosecutor took issue with Jefferson's contact

with his brother, a purported "public defender."  ART 794.  Jefferson stated during voir dire

that his brother was a criminal appellate attorney, with whom Jefferson had discussed two

criminal cases that his brother had argued before the Supreme Court.[4]  ART 676.  Finally,

the prosecutor also mentioned that Jefferson appeared too casual, something he was not

looking for in a juror, but stated that this reason alone would not be grounds for his exercise

of a peremptory challenge.  ART 794.  These four factors together formed the basis for the

prosecutor's peremptory challenge of Jefferson.

The trial court reviewed the <u>Batson</u> motion and found Ali had not carried his burden

of proving racial discrimination.  In reviewing the motion, the trial court stated that "[t]he

issue is whether or not the prosecutor's justification or the defendant's justification if the

issue were flipped is reasonable."  ART 812.  The trial court did not, however, make

_____

[4] It was unclear which Supreme Court Jefferson was referring to.  His brother practices
in Texas, so it was likely either the Texas or the United States Supreme Court.

10

specific findings in denying the motion.

### C.    State Appellate Court Decision

In reviewing the trial court's decision on the peremptory challenge issue, the state appellate court applied the three-part <u>Batson</u> test.  It noted that initially, the trial court had concluded that Ali had not established a prima facie case, but that the trial court had subsequently changed its ruling, found a prima facie showing of group bias, and then asked the prosecutor to articulate race-neutral reasons for striking Combs and Jefferson.  For purposes of Ali's appeal, the appellate court assumed that the trial court properly found that Ali established a prima facie case at step one, and noted that Ali did not dispute that the prosecutor provided facially race-neutral reasons for his peremptory challenges to Combs and Jefferson.

Turning to the third <u>Batson</u> step, proof of purposeful discrimination, the court of appeal then noted that it would apply a "clearly erroneous" standard of review, identical to the standard utilized by the United States Supreme Court in reviewing a state court's finding on the issue of discriminatory intent.  It found no error in the trial court's determination that Ali failed to show purposeful discrimination.  In support, the appellate court noted that the trial court had "closely questioned the prosecutor and weighed the proffered explanations" under the correct legal standards.  The court of appeal also concluded that state law did not require the trial court to make detailed findings in denying Ali's <u>Batson</u> motion.

As for Combs, the state appellate court affirmed the trial court's finding of no purposeful discrimination, rejecting Ali's argument that discriminatory intent should have been inferred from the prosecution's alleged reliance on Combs' initial responses while refusing to credit later, less equivocal responses.  Turning to Jefferson, the court similarly found that the record was devoid of any evidence that the prosecution possessed a racist attitude toward or distrust for African-Americans.

United States District Court

For the Northern District of California

1    In affirming the trial court, the state appellate court refused Ali's request to engage in

2  any comparative jury analysis, citing state law for the proposition that an appellate court

3  should not engage in such analysis when it did not occur at the trial court level.  See Exh.

4  11, at 17 n.6 (citing People v. Johnson, 30 Cal.4th 1302, 1325 (2003)).

5        **D.    Analysis**

6        Ali's arguments on this issue are two-fold.  First, he contends that the state appellate

7  court's failure to engage in comparative juror analysis in and of itself constituted a violation

8  of his constitutional rights under Batson.  Second, he argues that comparative juror

9  analysis reveals purposeful discrimination in violation of his Equal Protection rights.

10                  **1.    Case Law re: Comparative Juror Analysis**

11

12       The California Court of Appeal decided Ali's case on January 30, 2004, prior to the

13  United States Supreme Court's June 13, 2005 decision in Miller-El.  545 U.S. at 231.  In

14  Miller-El, the defendant was charged with capital murder.  At defendant's trial, the

15  prosecution used peremptory strikes against ten out of eleven prospective African-American

16  jurors.  Id. at 233.  The defendant objected that the strikes were based on race, but the

17  Texas trial court denied relief and sentenced defendant to death after the jury convicted him

18  of murder.  While the Miller-El defendant's state court appeal was pending, the United

19  States Supreme Court decided Batson, and the Texas appellate court remanded the case to

20  the trial court to determine whether the defendant could show that the prosecution

21  peremptorily struck the African-American jurors based on race under Batson.  On remand,

22  the trial court accepted the prosecution's race-neutral reasons for the strikes, and again

23  denied relief.

24       A federal district court then denied the defendant's request for habeas relief, and the

25  Fifth Circuit subsequently refused to grant a certificate of appealability ("COA"), concluding

26  that the defendant failed to establish a viable constitutional claim.  The Supreme Court

27  reversed the Fifth Circuit's denial of a COA, finding that it was at least debatable whether a

28

12

United States District Court

For the Northern District of California

1
2
3
4

violation of petitioner's constitutional rights had occurred, and remanded the habeas petition to the Fifth Circuit for consideration on the merits.  537 U.S. 322, 348 (2003).  The Fifth Circuit then denied the petition on the merits, and the Supreme Court again granted certiorari and subsequently considered the merits.  545 U.S. at 231.

5
6
7
8
9
10

The Supreme Court ultimately concluded that the prosecution in Miller-El had engaged in racial discrimination in its exercise of peremptory challenges.  The Court used comparative juror analysis for the first time on appeal to determine itself whether the prosecution had been motivated by racial bias in exercising its peremptory strikes.  Id. at 239-62.  It looked beyond the evidence that Miller-El had presented to the trial court and conducted a comprehensive comparative juror analysis.   Id.

11
12
13
14
15
16
17
18
19
20
21

At the third Batson step, the Court considered the written and oral statements made by all the prospective jurors and the prosecution's stated reasons for dismissing the African-American jurors in determining whether race played a role in the prosecution's use of its peremptory strikes.  Id.  The Court concluded that the prosecutor asked different questions of prospective minority jurors than those it asked of prospective non-minority jurors in order to elicit varying responses, which could then justify a peremptory strike on purportedly nonracial grounds.  Id. at 260.  The Court also found that there was evidence that court procedure permitted the prosecution to "shuffle" juror cards to keep African-American jurors from being drawn, and the record suggested that prosecutors' handbooks used in the jurisdiction recommended racial strikes.  Id. at 253-54, 263.   In granting relief based on the results of the comparative juror analysis, the Court stated

22
23
24
25

> [m]ore powerful than the[] bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve. If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.

26
27

Id. at 241.

28

Following the Court's decision in Miller-El, the state and federal courts have

13

United States District Court

For the Northern District of California

considered the role of comparative juror analysis on appeal.  In fact, after Miller-El, the Ninth Circuit subsequently amended and withdrew a 2004 decision in which it had held that an appellate court was not required to conduct comparative juror analysis in the first instance on appeal.  Boyd v. Newland, 393 F.3d 1008, 1014-15 (9th Cir. 2004), amended by 467 F.3d 1139, 1148 (9th Cir. 2006).  In the amended decision, the court held that "after Miller-El, we recognize that our previous reading of Batson was too narrow and that Batson does contemplate a comparative juror analysis on appeal."  Id.  "The Supreme Court . . . looked beyond the evidence that Miller-El presented to the trial court and conducted a comprehensive comparative juror analysis on appeal."  Id. (citing Miller-El, 545 U.S. at 241).

The Boyd court noted that "Miller-El made clear that comparative juror analysis is an important tool that courts should utilize in assessing Batson claims."  Id. (quoting Miller-El, 545 U.S. at 240).  It rejected the government's argument that any requirement for comparative juror analysis, as established by Miller-El, was barred by Teague v. Lane, 489 U.S. 288 (1989), since Miller-El was decided after the Boyd petitioner's conviction became final.  Id.  The Ninth Circuit reasoned that Miller-El did not create a new rule of criminal procedure, but simply clarified Batson.  Id. at 1146.  It further noted that in Miller-El, the Supreme Court applied its holding to Miller-El himself, whose conviction obviously became final prior to the Court's decision.  Id.  The Boyd court thus held that "if the Supreme Court's endorsement of comparative juror analysis on appeal constituted a new procedural rule, the Court would not have applied that rule to Miller-El, whose case came before the Court on an appeal from a denial of habeas corpus."  Id.

The Boyd court nevertheless qualified its holding, adding that "we do not hold that comparative juror analysis always is compelled at the appellate level . . . but comparative juror analysis is an important tool that courts *should* use on appeal."  Id. at 1148-49 (further stating that "[l]ike the California courts to address the issue, we do not hold that comparative juror analysis is *always* compelled at the appellate level").

14

United States District Court

For the Northern District of California

However, in its subsequent decision in <u>Kesser</u>, the Ninth Circuit went farther than it did in <u>Boyd</u> regarding the necessity of comparative juror analysis.  465 F.3d at 351.  The defendant/petitioner in <u>Kesser</u> was convicted of first degree murder.  During voir dire, the prosecutor struck three Native American women and one Asian woman.  <u>Id.</u> at 353.  At the defendant's request, the trial court conducted an evidentiary hearing, and required the prosecutor to explain the reasoning behind his strikes.  <u>Id.</u>  The prosecutor explained that he struck one of the potential Native American jurors because she worked for a tribe and he feared she was "inclined to favor Native American culture and institutions over 'the mainstream system,'" and that "Native Americans were 'resistive' and 'suspicious' of the criminal justice system."  <u>Id.</u> at 353-54.  He rated that juror a "C" overall, finding her to be "pretentious," "self-important," "somewhat unstable, fairly weak, and some[one] who . . . would be easily swayed by the defense."  <u>Id.</u>

Following the prosecutor's explanations, defense counsel expressed particular concern with the above stricken juror, arguing that it represented "classic example of . . . a presumption of a group bias based on a stereotype membership in a racial group . . . ."  <u>Id.</u> at 355.  The trial court, however, found sufficient justification to support all of the peremptory challenges and held that the juror was dismissed because she worked for a tribe, not because she was a member of the tribe.  <u>Id.</u>

The <u>Kesser</u> defendant appealed to the state courts, arguing that the prosecutor struck potential jurors on the basis of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment.  The state appellate courts affirmed the trial court, and on federal habeas review, this court denied Kesser relief, concluding that "although the trial court 'commit[ed] serious error in failing to recognize the bias inherent in one of the prosecutor's purportedly neutral reasons,' the court of appeal acted appropriately in finding that 'race was not the primary reason given by the prosecutor.'"  <u>Kesser v. Cambra</u>, 2001 WL 1352607 (N.D. Cal. 2001).

A divided Ninth Circuit panel originally affirmed this decision, but then the court

United States District Court
For the Northern District of California

granted a rehearing en banc and reversed.  <u>Kesser</u>, 392 F.3d 327 (9th Cir. 2004), <u>reversed by</u> 465 F.3d at 351; 425 F.3d 1230 (9th Cir. 2005) (granting rehearing). The en banc court held that the California Court of Appeal failed "to consider comparative evidence in the record before it [which] undeniably contradicted the prosecutor's purported motivations, [and] unreasonably accepted his nonracial motives as genuine."  465 F.3d  at 357.[5]  The court reasoned that <u>Batson</u> requires analysis of "'the totality of relevant facts' about a prosecutor's conduct," and it concluded that the "totality of relevant facts" includes the characteristics of the people the prosecutor did not challenge.  <u>Id.</u> at 360.  The court asserted that "[i]f a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar [non-minority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at <u>Batson</u>'s third step."  <u>Id.</u> at 361 (quoting <u>Miller-El</u>, 545 U.S. at 241).  The <u>Kesser</u> court ultimately concluded that the California courts' findings were not only wrong, but that the courts had engaged in an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  <u>Id.</u> at 358 (quoting 28 U.S.C. 2254(d)(2)).

The Ninth Circuit then conducted its own comparative juror analysis.  In doing so, it held that "comparative analysis is required even when it is not requested or attempted in state court."  <u>Id.</u> at 361.  It reasoned that

> The [Supreme] Court in <u>Miller-El</u> applied comparative juror analysis to a case originally tried in 1986, remanded for a <u>Batson</u> hearing in 1988, and appealed under AEDPA in 2000. The Court's holding means that the principles expounded in <u>Miller-El</u> were clearly established Supreme Court law for AEDPA purposes at least by the time of the last reasoned state court decision in <u>Miller-El</u>, handed down in 1992, before Kesser's 1993 trial.

<u>Id.</u> at 360.

The <u>Kesser</u> majority refuted the dissent's argument that it should not engage in

---

[5]The <u>Kesser</u> court noted that the California appellate court probably did not engage in comparative juror analysis itself because at the time of the state court's decision, California law did not require comparative juror analysis on appeal. The court, however, suggested that "[t]he California courts may wish to revisit this position in light of <u>Miller-El</u>." 465 F.3d at 360 n. 3.

comparative juror analysis because the "factual basis" for such analysis had not been presented to the state appellate courts. Id. at 361. The court concluded that "the 'factual basis' for comparative juror analysis is contained in the voir dire, which was submitted to the California Court of Appeal and was part of the evidence presented in the State Court proceeding." Id. It further noted that the Supreme Court reached a similar conclusion in Miller-El, holding that "[t]here can be no question that the transcript of voir dire, recording the evidence on which Miller-El bases his arguments and on which [the Court] base[s] [its] result, was before the state courts." Id. (quoting Miller-El, 545 U.S. at 241 n.2) (asserting that the Miller-El dissent "conflate[d] the difference between evidence that must be presented to the state courts to be considered by federal courts in habeas proceedings and theories about that evidence").

Noting that like the Miller-El Court, it, too, had the voir dire transcripts and juror questionnaires before it, the Kesser court then concluded that comparative juror analysis revealed that the prosecutor's justifications clearly demonstrated racial bias, which was more than sufficient to justify granting the writ on the basis of the comparative juror analysis alone. Id. at 361, 368.

Accordingly, after Kesser, at least in the Ninth Circuit, the requirement that appellate courts engage in comparative juror analysis, even if such an analysis did not occur at the trial court level, has been determined to be clearly-established Supreme Court law under Miller-El. However, Kesser did *not* explicitly state that a state appellate court's failure to engage in such analysis is in and of itself an unreasonable application of clearly-established Supreme Court law for purpose of federal habeas review. Nor has the Ninth Circuit articulated *which* appellate court, on federal habeas review, should perform the comparative

////

////

////

17

United States District Court
For the Northern District of California

1    juror analysis.[6]

2        The state courts have similarly struggled with the issue.  Prior to the Supreme Court's

3    decision in Miller-El, the California Supreme Court, in the case relied on by the California

4    Court of Appeal in this very case, disapproved of conducting comparative juror analysis for

5    the first time on appeal.  See Johnson, 47 Cal.3d at 1220-21.  Following Miller-El, unlike the

6    Ninth Circuit, the California Supreme Court has not held that the Supreme Court's decision

7    in Miller-El requires comparative jury analysis in the first instance on appeal; instead, the

8    state courts, including the California Supreme Court, have, for the most part, simply gone

9    ahead and, assuming without deciding the issue, conducted such analysis.  See People v.

10   Zambrano, 2007 WL 2164057 at *14 (Cal. July 30, 2007); People v. Stevens, 41 Cal.4th

11   182, 196 (Cal. 2007).  The California Supreme Court, however, granted review in a case

12   that will resolve the issue for the state appellate courts.  See People v. Lenix, California

13   Supreme Court No. S148029.

14                    **2.    State Appellate Court's Failure to Engage in Comparative Juror**
                              **Analysis**
15

16       Here, the state appellate court failed to engage in comparative juror analysis at the

17   time of Ali's appeal because California Supreme Court caselaw discouraged such analysis

18   for the first time on appeal.  However, the legal landscape shifted with the United States

19   Supreme Court's decision in Miller-El, and with the Ninth Circuit's decisions in Boyd and

20   Kesser interpreting Miller-El.  In fact, as noted in Kesser, the Ninth Circuit concluded that the

21   comparative juror analysis requirement was clearly-established federal law as of 1992, prior

22   to when Ali's conviction became final.  Because this court is bound by Ninth Circuit

23   decisions, it must assume for purposes of this federal habeas petition that the state

24

25   _____

26       [6]The Ninth Circuit has implicitly addressed these issues in at least two unpublished
     decisions issued after its decision in Kesser.  Review of the unpublished decisions suggests
27   that where the state court fails to engage in comparative juror analysis at the third Batson step,
     the Ninth Circuit will simply conduct its own comparative juror analysis, and that if the results
28   of the analysis do not indicate purposeful discrimination, then any failure by the state court to
     engage in such analysis will be considered harmless.

United States District Court

For the Northern District of California

1    appellate court's failure to conduct a comparative juror analysis at step three of its <u>Batson</u>

2    analysis was contrary to clearly established federal law.

3        However, that in and of itself does not entitle Ali to relief on this claim.  The United

4    States Supreme Court recently confirmed that "when a state court's adjudication of a claim

5    is dependent on an antecedent unreasonable application of federal law," this court "must

6    then resolve the claim without the deference that AEDPA otherwise requires."  <u>Panetti v.</u>

7    <u>Quarterman</u>, 127 S.Ct. 2842, 2858 (June 28, 2007).  Accordingly, this court is not required

8    to grant relief, but instead reviews de novo whether or not Ali has established purposeful

9    discrimination at step three of the <u>Batson</u> test.  <u>See id.</u>; <u>see also</u> <u>McCollum v. Papa</u>, 2007

10   WL 2316345 at *1 (9th Cir. Aug. 14, 2007) (same).[7]

11       It is apparent to this court that the Ninth Circuit's interpretation of <u>Miller-El</u> mandates

12   comparative juror analysis in this case.  It is still unclear to the court, though, at which level

13   the comparative juror analysis should take place.  For example, should this court grant the

14   writ and remand the case to the state appellate court(s) for purposes of conducting the

15   analysis?  Or should the court simply undertake its own comparative juror analysis?

16       As a practical matter, it appears that the effect of the Ninth Circuit's decision in

17   <u>Kesser</u> will be to require federal district courts, on habeas review, to conduct such analysis

18   in the first instance when the state appellate court decisions occurred prior to <u>Miller-El</u>.  As

19   noted, the state appellate courts have only begun engaging in such analysis recently

20   because state law previously discouraged analysis for the first time on appeal.  Thus, in

21   many currently pending federal habeas cases, there will have been no such analysis, and it

22   will be incumbent upon either the district court or the Ninth Circuit on appeal to conduct the

23   requisite analysis required by <u>Kesser</u>, assuming that the Ninth Circuit does not instruct

24

25   _____

26       [7]The court notes that Ali also contends that the state appellate court's decision affirming
     the trial court was unreasonable because the trial court applied the wrong legal standard in
27   evaluating the prosecution's proffered justifications at step three of the <u>Batson</u> test.  However,
     because this court will review step three de novo, and will apply clearly-established Supreme
28   Court law in evaluating the prosecution's reasons, this issue is moot.

United States District Court

For the Northern District of California

district courts to remand the cases to state court for this purpose.

In spite of the uncertainty, the court elects to conduct its own comparative juror analysis, and has comprehensively reviewed the juror questionnaires and voir dire transcript, in addition to other portions of the record before it.

### 3.    Comparative Juror Analysis for This Case

As noted, the prosecutor's first reason for striking Combs was based on his concern with her equivocal answers about whether the molestation of her daughter would affect her ability to serve as an objective juror.  Although Combs' initial response was somewhat hesitant, her later responses to the prosecutor's questioning about law enforcement's handling of the case were positive and unequivocal.  ART 252.  Combs felt her daughter had been treated with respect by law enforcement.  ART 252.  Nothing in her answers indicated that Combs might be biased against law enforcement.  While the State is correct that the prosecutor is entitled to credit an initial hesitant response despite a juror's later, more affirmative responses, this rationale is not convincing given the unchallenged jurors' responses in this case.  See Rice v. Collins, 546 U.S. 333, 342 (2006).  The record is replete with examples of other jurors qualifying or even completely changing their answers.  ART 92, 164-165, 323, 450, 452, 632, 714, 780, 847.[8]  Therefore, comparative juror analysis undermines this particular explanation for the prosecution's challenge to Combs.

However, as part of his first justification, the prosecutor also expressed concern with Combs' involvement in the criminal justice system as a result of the molestation incident.  Ali contends that other seated jurors also had incidents of domestic violence, which were more directly tied to the case at hand and also indicated bias.  ART 243, 262, 369, 431.  However, the prosecutor was more concerned about a potential juror's involvement in the criminal

---

[8] For example, when asked about his ability to listen carefully to the evidence, Trial Juror No. 9 stated: "I would certainly try my best to do that."  ART 165.  Also, Trial Juror No. 3 responded to a question regarding the effect of Ali's substance abuse on her judgment of the case by stating: "I don't think it would affect my judgment."  ART 323.

United States District Court

For the Northern District of California

justice system generally rather than with specific incidents of domestic violence.  For

example, the prosecutor excused another juror, David Whitney, who also had an incident of

molestation in his family.  ART 66-67.  Both Combs and Whitney, had significant experience

in their pasts with the criminal justice system as a result of the molestation incidents.  This

experience with the criminal justice system clearly differentiated Combs (and Whitney) from

similarly-situated jurors who were permitted to serve.  Neither juror to whom Ali refers, Trial

Juror No. 6 nor Trial Juror No. 8, actually filed charges or went through the legal process.[9]

Therefore, the prosecutor's concern with a potential juror's, including Combs', involvement

in the system was legitimate and consistently applied without apparent discriminatory

purpose.

As noted, the prosecutor's second reason for Combs' excusal concerned her

attitudes regarding the attorneys' professionalism and conduct in the courtroom.  Contrary to

the prosecutor's statement in connection with the Batson motion, Combs never stated that

the level of professionalism would "affect" her.  Additionally, the record demonstrates Trial

Juror No. 1 had similar expectations of professionalism and was seated without challenge.

ART 431-32.  The prosecutor himself gave a short speech about the level of professionalism

the attorneys would maintain during the trial, thus suggesting that this expectation was not

unreasonable or particularly relevant to Combs' ability as a juror.  ART 201.  Thus,

comparative juror analysis fails to support the prosecutor's justification on this point as well.

The prosecutor's final justification was that Combs' Christian faith would interfere with

her ability to judge Ali.  Initially, it is worth noting that the prosecutor misstated Combs'

response.  He restated her answer as affirmatively stating that she would have a problem

with judging.  ART 791.  However, Combs never explicitly indicated that her religion would

affect her ability as a juror, but rather pointed out the distinction between the types of

_____

[9] Trial Juror No. 8 responded to a question regarding her friend, a victim of domestic violence, with "I cannot say that would not be part of my opinion in my thought process."  ART 430.  Defense counsel then asked ". . .[F]rom what I'm hearing, there may be a bit of bias if you sat as a juror on this case, is that correct?", to which she replied, "That's correct."  ART 431.

**United States District Court**
For the Northern District of California

1 judging as evidence that her roles as a juror and as a Christian would not conflict.

2 Furthermore, contrary to the prosecutor's statement, it was not through defense counsel's

3 questioning that Combs drew this distinction, but rather through her own personal reflection.

4 ART 400.

5      Nevertheless, as compared to other similarly-situated unchallenged jurors, Combs'

6 reflections on her religion's impact on her judgment as a juror did indicate some hesitancy

7 on her part.   Ali points to another juror questioned on his religion, Alternate Juror No. 3, as

8 expressing similar views to Combs on the issue of judgment and religion.  However, this

9 juror did not raise any questions about judgment; rather, he simply responded that he didn't

10 believe his religion would interfere.  Furthermore, the court notes that the prosecutor

11 exercised a peremptory challenge on another juror, Ms. Marck, who, like Combs, stated that

12 her Buddhist religion would not affect her abilities to judge Ali.  ART 308.  Thus, the

13 prosecutor's concern with the effect of religious beliefs on a juror's ability to remain objective

14 was equally applied to minority and non-minority jurors, and does not demonstrate racial

15 discrimination.  ". . . [C]ounsel is entitled to exercise his full professional judgment in

16 pursuing his client's legitimate interest in using peremptory challenges. . ." Burks v. Borg,

17 27 F.3d 1424, 1429 (9th Cir. 1994) (quoting J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127

18 (1994)).

19      On balance, comparative juror analysis calls into question two of the prosecutor's

20 proffered justifications, including Combs' alleged equivocal statements about the incident of

21 molestation in her family and her concern with the professionalism of the attorneys.

22 However, the other two justifications, Combs' involvement in the criminal justice system and

23 the impact of religion on her judgment, were equally applied to other unchallenged non-

24 minority jurors, and therefore support a finding that the prosecutor's use of a peremptory

25 strike as to Combs was race-neutral.

26      Turning to the other juror at issue, as noted, the prosecutor's first justification for

27 striking Darrell Jefferson was his concern that Jefferson would "over-intellectualize" the

28

United States District Court
For the Northern District of California

1   case.  Ali points to several seated jurors who also displayed "intellectual proclivities" during

2   the course of voir dire.  However, the prosecutor's concern with Jefferson is more

3   appropriately characterized as involving Jefferson's ability to withhold judgment until the

4   close of the evidence than his intellectualism.[10]

5        Though a juror's professed decisionmaking process is a subjective factor, it "may

6   play a legitimate role in the exercise of challenges."  Id. at 1429.  While Jefferson's response

7   during voir dire regarding the decisionmaking process and assessment of information was a

8   very thoughtful and realistic reflection on human nature, it also suggested that he may not

9   wait until all the evidence had been submitted before rendering a judgment.  ART 700.

10  Maintaining an open mind was a point the prosecution emphasized consistently throughout

11  the course of voir dire with multiple prospective jurors.[11]  Also, the prosecution exercised a

12  peremptory challenge on a Caucasian juror, David Whitney, whom the trial judge similarly

13  characterized as "independent minded."  ART 812.  Thus, comparative juror analysis

14  demonstrates this justification was racially neutral.

15       The prosecution's second justification involved Jefferson's "smart-ass" response to

16  one of the prosecutor's questions.  This can be analyzed together with his comment that

17  Jefferson was too casual, as both reflect on Jefferson's demeanor and attitude, a legitimate

18  basis for exercising a peremptory strike.  Id.  As Ali points out, the phrasing of the

19  prosecutor's question could have indicated that he had felt Jefferson had indicated bias

20  during the course of voir dire.  Although Jefferson may have been justified in asserting that

21  he would not be biased, it was credible that the prosecutor interpreted his response as

22  offensive or "smart-ass."  "[P]eremptories are often the subject of instinct," and it is possible

24       [10] The prosecutor remarked as follows regarding Jefferson's potential to "over-intellectualize":  "I want jurors, what I think Mr. Morales [Ali's defense counsel] was striving for
25  with him, about keeping an open mind until the end and not making decisions."  ART 793.

26       [11] Some examples include the prosecutor's questioning of Trial Juror No. 4 about being
    "open-minded" about psychiatric testimony (ART 222); his statement that "[w]e're exploring to
27  find out if anybody has opinions that could keep them from fairly listening to the evidence. . ."
    (ART 290); and his statement to Mr. Moura, another potential juror, that the judge will instruct
28  them:  "Don't arrive at a quick decision, keep an open mind."  ART 319.

United States District Court

For the Northern District of California

that this exchange led the prosecutor to believe Jefferson was biased against him by joking at his expense.  Miller-El, 545 U.S. at 252.   Ali fails to point to another juror, seated without challenge, who could be compared to Jefferson in this respect, except to contend that defense counsel also drew some laughter from the jury at his expense.

Finally, the prosecutor cited Jefferson's relationship with his brother, a "public defender," as a cause for concern.  Ali notes that Trial Juror No. 2, who was seated without challenge from the prosecution, had an uncle in Georgia who was also a public defender.  However, Jefferson demonstrated more familiarity with his brother's work and claimed to have discussed two criminal defense cases with him.  ART 676.  In comparison, Trial Juror No. 2 indicated that she had never talked to her uncle about the cases he was involved in and talked to him rarely in general.  ART 661.  Thus, there is a wide disparity between Jefferson and Juror No. 2 in terms of their interaction with and knowledge of the criminal justice system.

Ali also makes much of the fact that Jefferson's brother is not actually involved in criminal defense but rather does civil appellate work.  However, Jefferson represented during questioning that the cases he had discussed with his brother had been criminal cases before the Supreme Court.  Accurate or not, this is the information that was available to the prosecutor at the time of the Batson/Wheeler motion.  The prosecutor did represent that he had some outside knowledge of Jefferson's brother as a criminal defense attorney due to the publicity surrounding his appointment to the Texas Supreme Court, which ultimately turned out to be incorrect.  However, the record supports the prosecutor's belief that Jefferson had experience with criminal defense through his brother.

### 4.    Conclusion

Having reviewed the record de novo and having conducted a comparative juror analysis, the court finds that the evidence of racial discrimination pales in comparison to that in Miller-El and Kesser.  In Miller-El, the evidence of discrimination was bolstered by instances of jury shuffling and disparate questioning between minority and non-minority

24

United States District Court

For the Northern District of California

1
2
3
4
5
6
7

jurors, in addition to the concerns raised by the comparative juror analysis in that case. Miller-El, 545 U.S. at 231.  There, the prosecution used peremptory strikes against 10 of 11 prospective African-American jurors.  Id. at 233.  Comparative juror analysis revealed that the prosecution's justifications were not applied equally to non-minority jurors.  Id.  The prosecution also shuffled the jury twice, moving African-American jurors to the back of the jury pool.  Finally, the prosecutor posed different questions to African-American jurors, using more graphic terms before asking their opinion on the death penalty.  Id.

8
9
10
11
12
13
14
15
16
17
18

Similarly, in Kesser, some of the prosecutor's justifications themselves were barely facially neutral as they were tinged with racial stereotyping against Native Americans and closely tied to race.  Kesser, 465 F.3d at 351.  When proffering his justifications, the prosecutor used blatant racial and cultural stereotypes.  Id. at 357.  He identified the challenged jurors by their skin color and stated that he challenged them due to his experience with Native Americans as resistant to mainstream culture and suspicious of the criminal justice system.  Id.  The prosecutor was also concerned that the prospective jurors may be tolerant of child molestation because of their association with the Native American tribe.  Id.  When analyzed by comparative juror analysis, the prosecutor's justifications clearly demonstrated racial bias, which was more than sufficient to justify granting the writ on the basis of the comparative juror analysis alone.  Id.

19
20
21
22
23
24

In contrast, no such evidence is present in this case.  While the instant comparative juror analysis does reveal some minor faults in the prosecutor's reasoning, the court finds that these faults do not demonstrate racial bias or pretext.   The court further finds that the prosecution's race-neutral justifications were sufficiently credible, clear, and reasonably specific.  It therefore concludes that based on the totality of relevant facts, Ali has not shown purposeful discrimination at step three of the Batson test.

25
26

For these reasons, the court denies habeas relief for this claim.

27

////

28

25

United States District Court

For the Northern District of California

## II.    The Special Manslaughter Jury Instruction Did Not Violate Ali's Constitutional Rights

Ali also asserts that his due process rights were violated by the special manslaughter instruction given at his trial, claiming it precluded the jury from convicting him of voluntary manslaughter and reduced the burden of proof required of the State.

At trial, the judge gave the standard instruction defining provocation, CALJIC 8.42,[12] and additionally, instructed the jury pursuant to a special instruction proffered by the prosecutor which emphasized that provocation should be judged by an objective standard. The special instruction, as read to the jury, provided:

> The ordinarily reasonable person of average disposition is measured by an objective standard.  Evidence of the defendant's personal characteristics is not relevant as to the determination of the conduct of an ordinarily reasonable person of average disposition.

Reporter's Transcript ("RT") at 3456, People v. Ali, San Mateo County Super. Ct. (No. SCO46199A); see also Exh. 3.

During his closing argument, the prosecutor made the following statements with respect to the special instruction:

> There has to be a heat of passion at the time of the crime that would be

_____

[12] CALJIC 8.42 provides:

> The heat of passion that will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances.  A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which the defendant was placed and the facts and circumstances that confronted him were such as also would have aroused the passion of the ordinarily reasonable person faced with the same situation.  Legally adequate provocation may occur in a short, or over a considerable, period of time.  The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than judgment . . .

> CALJIC 8.42; see also Exh. 2 at 48.

26

aroused in the mind of the ordinarily reasonable person in the same circumstances.  The facts of the case must be such that they would provoke the ordinarily reasonable person to attack the victim and inflict fatal injury on the victim.  That's what the average ordinarily reasonable person would do. Not the defendant.

RT 3307.

The prosecutor continued to explain that the law did not allow Ali to set up his own standard to excuse or justify the attack.  "To go down to this level of manslaughter. . . [the standard is whether] the average, ordinary reasonable person would engage in this conduct when facing those circumstances."  RT 3308.  The prosecutor also emphasized that the provocation must come from the victim, and cannot be in response to the provocation of third parties.  RT 3308.

Additionally, during his closing argument, the prosecutor asserted that the provocation may occur over either a short or long time.  He stated that "it must involve an emotion that causes the killer to act from impulse or rashness rather than choice," and that slight provocation is insufficient to reduce the crime to manslaughter.  RT 3308.

Further, the prosecutor emphasized that the standard was objective.  "It is not the average person who used drugs.  [Ali's] personal characteristics. . . [such as being] somebody quick to anger, anything like that, [is] not a factor."  RT 3309.

Finally, the prosecutor concluded:

Because the average, reasonable person, even hearing what [Ali] said was the case, even hearing what he said that she called him some names, that Tracey called him some names and slapped him or punched him, the average, reasonable person is going to strangle?  I don't think that's a standard any jury would want to set, and I know you won't do so either.  This case is premeditation.  This case is deliberation.

RT 3309.

Ali argues that his due process rights were violated by the special instruction because the jury could have interpreted it to mean that in order to find him guilty of manslaughter rather than murder, it would first have to find that the provocation would have induced the

27

United States District Court

For the Northern District of California

1    same violent act by an ordinarily reasonable person of average disposition.  Ali also

2    challenges the related portions of the prosecutor's closing argument, which he argues

3    misled the jury and prevented it from reaching a verdict of voluntary manslaughter.

4        On appeal, the California Court of Appeal concluded that the special instruction

5    comported with California law, and thus there was no instructional error.  Although the court

6    did not explicitly state that it found the instruction ambiguous, nevertheless it analyzed the

7    instruction under the standard applicable to the analysis of ambiguous instructions.  The

8    state appellate court found that the special instruction merely restated a well-settled

9    standard for judging provocation, and was not in error.  It held that "[i]t is undisputed that an

10   objective, reasonable person standard applies in judging the adequacy of provocation, and

11   that a defendant's personal characteristics, including intoxication, mental deficiencies, and

12   psychological dysfunctions due to traumatic experiences, are irrelevant to that

13   determination."  The appellate court also found that the instruction's reference to "conduct"

14   did not improperly "shift focus" to Ali's actions, but rather restated a principal of law

15   contained in the standard jury instruction, CALJIC 8.42, that a defendant may not set up his

16   own standard of conduct.  Thus, it concluded that there was no reasonable likelihood that

17   the jury misunderstood the special instruction.

18       Additionally, the appellate court found that Ali had waived his right to object to the

19   prosecutor's closing argument due to his failure to object at trial, and that a general attack

20   on the summation was not cognizable on appeal.  However, it reviewed portions of the

21   closing argument which were relevant to the jury's potential misunderstanding of the

22   instruction and found that the prosecutor spent little time characterizing the special

23   instruction, and was not inaccurate in doing so.  It determined that the prosecutor correctly

24   stressed the objective standard applicable to the law of provocation.

25       A challenge to a jury instruction solely as an error under state law does not state a

26   claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S.

27   62, 71-72 (1991).  Nor does the fact that a jury instruction was inadequate by Ninth Circuit

28

United States District Court

For the Northern District of California

1   direct appeal standards mean that a petitioner who relies on such an inadequacy will be

2   entitled to habeas corpus relief from a state court conviction.  See Duckett v. Godinez, 67

3   F.3d 734, 744 (9th Cir. 1995) (citing Estelle, 502 U.S. at 71-72), cert. denied, 517 U.S. 1158

4   (1996).

5        To obtain federal collateral relief for errors in the jury charge, a petitioner must show

6   that the ailing instruction by itself so infected the entire trial that the resulting conviction

7   violates due process.  Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973);

8   see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("[I]t must be established not

9   merely that the instruction is undesirable, erroneous or even 'universally condemned,' but

10  that it violated some [constitutional right].").  The instruction may not be judged in artificial

11  isolation, but must be considered in the context of the instructions as a whole and the trial

12  record.  Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in

13  the context of the overall charge to the jury as a component of the entire trial process.

14  United States v. Frady, 456 U.S. 152, 169 (1982).

15       In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could

16  or would have understood the instruction as a whole; rather, the court must inquire whether

17  there is a "reasonable likelihood" that the jury has applied the challenged instruction in a

18  way that violates the Constitution.  Estelle, 502 U.S. at 72 & n.4; Boyde v. California, 494

19  U.S. 370, 380 (1990); see Ficklin v. Hatcher, 177 F.3d 1147, 1150-51 (9th Cir. 1999)

20  (harmless error when certain that jury did not rely on constitutionally infirm instruction).  A

21  determination that there is a reasonable likelihood that the jury has applied the challenged

22  instruction in a way that violates the Constitution establishes only that an error has occurred.

23   See Calderon v. Coleman, 525 U.S. 141, 146 (1998).  If an error is found, the court also

24  must determine whether the error had a substantial and injurious effect or influence in

25  determining the jury's verdict, see Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), before

26  granting relief in a habeas proceedings.  See Calderon, 525 U.S. at 146-47; see, e.g.,

27  Sarausad v. Porter, 479 F.3d 671, 679 (9th Cir. 2007) (finding reasonable likelihood that jury

28  applied ambiguous instruction on accomplice liability to find petitioner guilty of murder in a

29

United States District Court

For the Northern District of California

way that relieved the State of its burden of proof, and that this error was not harmless).

However, if the disputed instruction is erroneous on its face, the "reasonable likelihood" standard employed for ambiguous jury instructions is not required. Ho v. Carey, 332 F.3d 587, 592 (9th Cir. 2003).  For example, if a jury instruction omits a necessary element of the crime, constitutional error has occurred. Id.; see also id. at 593 (finding jury instructions "erroneous" rather than ambiguous, where they included an uncorrected erroneous instruction that second-degree murder could be based on a finding of general intent, but also included an accurate description of the elements of second-degree murder, including specific intent).  Actual prejudice is still required before relief may be granted, however. See id. at 595 (citing Brecht, 507 U.S. at 637).

As noted, the California Court of Appeal never explicitly stated whether it considered the instruction to be ambiguous or erroneous.   However, since it analyzed the instruction under the "reasonable likelihood standard," see Estelle, 502 U.S. at 72 & n.4, it presumably interpreted the instruction as ambiguous rather than erroneous.  Nevertheless, Ali contends that the special instruction was indeed facially erroneous because the reasonable man does not kill, and a standard which requires a reasonable person to act homicidally under the given circumstances is an impossible standard to attain.

His arguments are not persuasive, though, given Ninth Circuit law to the contrary.  An example of an erroneous instruction is one which omits a necessary element of the law. Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994), *overruled on other grounds*, Rohan ex. rel Gates v. Woodford, 334 F.3d 803, 815 (9th Cir. 2003).  The special instruction in this case did not omit any element of the homicide charge, and also did not contain any explicit misstatement of the law. Sarausad, 479 F.3d at 690 (concluding that the lack of an explicit misstatement of law in the contested jury instruction rendered it ambiguous rather than erroneous).  Furthermore, contrary to Ali's arguments otherwise, the term "conduct" as utilized by the special instruction is ambiguous at best.  It could refer to the petitioner's aroused passions in reaction to the particular circumstances, or it could refer to his actions

30

United States District Court
For the Northern District of California

as a result of those passions.  Given these dual interpretations, the state appellate court's treatment of the instruction as ambiguous rather than erroneous was not unreasonable.[13]

The California Court of Appeal's conclusion that no instructional error occurred was not unreasonable.  As noted, the trial court instructed the jury pursuant to CALJIC 8.42, which states that a defendant may not set up his own standard of conduct and justify or excuse his actions because of personal characteristics.  Additionally, the jury was instructed to consider the instructions as a whole and in light of all the others pursuant to CALJIC 1.01.  When read alongside and in light of CALJIC 8.42, the special instruction merely reemphasized that Ali's personal characteristics were not relevant.  The special instruction did not improperly focus the jury's attention on the homicide, but instead emphasized that it was required to consider whether Ali's level of arousal constituted that of an ordinary, reasonable person under the circumstances.  Thus, any potential juror confusion regarding the standard of provocation, resulting from the special instruction, would have been resolved by the other instructions provided to the jury.

Additionally, as noted, the appellate court reviewed only the portions of the prosecutor's summation that were relevant to the special instruction, and determined they were not erroneous.  The appellate court's decision in this regard was also reasonable.  Even if certain portions of the prosecutor's statement relating to the special instruction may have been potentially misleading, they comprised only a small part of the closing argument, and also correctly stated the law in large part.  Further, "[a]rguments of counsel generally carry less weight with a jury than do instructions from the court . . . [T]hey are not to be

---

[13] It is unclear under Ninth Circuit law whether the characterization of a jury instruction as ambiguous constitutes a mixed question of law and fact, or otherwise.  Wade, 29 F.3d at 1320 (concluding that the contested instruction was erroneous rather than ambiguous without stating under which section of AEDPA it analyzed the lower court's conclusion); Ho v. Carey, 332 F.3d at 595 (determining that a state appellate court's analysis of an instruction as ambiguous rather than erroneous was incorrect and conducted a *de novo* analysis without stating the standard for overturning the state court's determination).  Given the uncertainty, this court considered this issue in light of the habeas standards applicable to both, and without deciding the standard of review issue, concludes that under any standard – the least deferential *and* the most deferential standard, Ali is not entitled to relief on this claim.

**United States District Court**

For the Northern District of California

judged as having the same force as an instruction from the court.  And arguments of counsel, like the instructions of the court, must be judged in the context in which they are made."  Boyde, 494 U.S. at 384.  Additionally, the trial judge's instruction to the jury that "if anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow those instructions," reduced the likelihood that the jury blindly followed the law as described by the prosecutor in the closing argument.  RT 348.

Moreover, the jury's request for additional copies of jury instructions also suggests that it adequately reviewed the instructions for itself.  RT 3490.  Given the jury instructions as a whole, the trial court's utilization of the special instruction, in combination with the challenged portions of the prosecutor's closing argument, did not create a reasonable likelihood that the jury applied the special instruction in a manner that violated Ali's due process rights.  Accordingly, the California Court of Appeal's decision was not an objectively unreasonable application of Supreme Court law; nor was it based on an unreasonable determination of the facts.  For these reasons, Ali's claim fails.

**III.  Ali Was Not Denied Effective Assistance of Counsel**

On a related note, Ali also contends that his counsel's failure to object to the special instruction and related portions of the prosecutor's closing argument deprived him of effective assistance of counsel as guaranteed by the Sixth Amendment.

Ali asserts that his trial counsel was ineffective in failing to object specifically to the portion of the prosecutor's closing statement in which the prosecutor analogized the deliberation required to establish first-degree murder to "changing lanes on the freeway." The prosecutor used the analogy in an attempt to demonstrate that Ali had deliberated and was not acting in the heat of passion when he killed Biletnikoff.  Ali contends that this analogy improperly conflated the definitions of intent and deliberation, which prejudiced the outcome of the trial by reducing the State's burden of proof on the first-degree murder charge.

32

United States District Court

For the Northern District of California

In his closing argument, the prosecutor defined deliberation as the "careful thought and weighing of considerations for and against the act." ART 3301. He emphasized that the duration of time spent deliberating is not as important as the extent of the reflection. ART 3301. The prosecutor analogized deliberation to driving home on the freeway during rush hour while attempting to switch lanes. He compared a defendant's lack of deliberation to a driver "changing lanes" without looking or thinking about the act. ART 3301. Then, he continued to explain that deliberation is similar to evaluating whether or not to change lanes:

> [Y]ou do what most of us would do, which is, first thing you do is look in your rearview mirror. Any cars coming that way? And then you look in your side mirror, and then you do a quick look over your left shoulder, something that might take three or four seconds at most to do. But you reflect on it. If there is a car coming, you go? No, you can't do it. If there is no car coming, you say okay, I'm safe. That just couple of seconds of reflection. That would mean what we call deliberate. That is a deliberate act. That's why the law tells you time is not the key factor. Premeditation and deliberation.

RT 3301-3302.

Ali raised the ineffective assistance of counsel claim in his petition for writ of habeas corpus before the California Court of Appeal, which issued a "postcard denial," denying review without comment. The California Supreme Court also denied review without comment. Where the state court issues a "postcard denial," this court construes the denial as one on the merits and sufficient for exhaustion purposes. See Greene v. Lambert, 288 F.3d 1081, 1086-87 (9th Cir. 2002). Therefore, this court must conduct an independent review of the record and the relevant federal law to determine whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law." Delgado, 223 F.3d at 982.

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e.,

United States District Court

For the Northern District of California

1   that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

2   of the proceeding would have been different." Id. at 694.

3       To show that counsel's performance was deficient, a petitioner must demonstrate that

4   counsel made errors so serious that counsel was not functioning as the "counsel"

5   guaranteed by the Sixth Amendment. See id. at 687.  The petitioner must show that

6   counsel's representation fell below an objective standard of reasonableness under

7   prevailing professional norms. See id. at 688.  The relevant inquiry is not what defense

8   counsel could have done, but rather whether the choices made by defense counsel were

9   reasonable. See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).  Judicial scrutiny

10  of counsel's performance must be highly deferential, and a court must indulge a strong

11  presumption that counsel's conduct falls within the wide range of reasonable professional

12  assistance. See Strickland, 466 U.S. at 689.

13      Second, the petitioner must show that counsel's errors were so serious as to deprive

14  the petitioner of a fair trial, a trial whose result is reliable. Id. at 688.  The test for prejudice

15  is not outcome-determinative, i.e., petitioner need not show that the deficient conduct more

16  likely than not altered the outcome of the case; however, a simple showing that the defense

17  was impaired is also not sufficient. Id. at 693.  The petitioner  must show that there is a

18  reasonable probability that, but for counsel's unprofessional errors, the result of the

19  proceeding would have been different; a reasonable probability is a probability sufficient to

20  undermine confidence in the outcome. Id. at 694.

21      Where the petitioner is challenging his conviction, the appropriate question is

22  "'whether there is a reasonable probability that, absent the errors, the factfinder would have

23  had a reasonable doubt respecting guilt.'" Id. at 695; see, e.g., Plascencia v. Alameida, 467

24  F.3d 1190, 1201 (9th Cir. 2006) (ineffective assistance of counsel claim not established

25  because "any prejudicial effect was at best minute" from counsel's failure to object to

26  evidence about existence of a drug in murder defendant's system where only killer's identity

27  was in dispute); Pirtle v. Morgan, 313 F.3d 1160, 1170-71 (9th Cir. 2002) (finding prejudice

28

United States District Court

For the Northern District of California

where counsel failed to request a diminished capacity instruction, which left the jury with no legal context to evaluate expert testimony about effect of chronic drug abuse on petitioner's ability to premeditate).

### A.    Deficient Performance

Ali asserts that counsel's failure to object to the special instruction and the prosecutor's related closing argument was not a tactical decision within the range of reasonable trial decisions.  As proof, Ali submits a declaration from his defense counsel in which his counsel attests that in hindsight, he did not realize the grave effect of the special instruction and related closing argument on the case, as he had never defended a case with a viable voluntary manslaughter defense.  Additionally, Ali provides a declaration from an experienced criminal defense attorney, Philip Barnett, who claims that the San Mateo County District Attorney's office has a history of characterizing the definition of provocation in the manner employed by the prosecution in Ali's case, which Barnett attests he typically rebuts during his closing statement.

However, this evidence fails to demonstrate that Ali's counsel was deficient.  The state appellate court concluded that the special instruction was a correct statement of California law.  There is no reason to believe that the trial court would have sustained the objection had defense counsel objected to the instruction on due process grounds.  The appellate court also found that the prosecutor's characterization of the special instruction in his closing argument was not erroneous, thus also suggesting that any objection would not have been sustained.  Counsel's failure to make a fruitless objection is not ineffective assistance of counsel.  Rupe v. Wood, 93 F.3d 1434, 1444-45 (9th Cir. 1996).

Additionally, the issue is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable.  See Babbitt, 151 F.3d at 1173.  Counsel's decision not to object to the special instruction or the closing argument was not unreasonable, even if in retrospect he might have done things differently.  The benefit of hindsight does not establish that Ali's counsel's choices fell outside a range of

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

reasonable conduct.  Strickland, 466 U.S. at 689.  Accordingly, Ali fails to demonstrate that his attorney's performance was deficient.

### B.    Prejudice

Having concluded that Ali has not demonstrated deficient performance, the court is not required to address the prejudice prong.  Id. at 697.  Nevertheless, the court concludes that Ali cannot demonstrate that there is a reasonable likelihood that counsel's failure to object altered the outcome of his trial.

Ali contends that his counsel's failure to object prejudiced him by preventing the jury from convicting him of a lesser crime than first-degree murder.  However, even assuming that counsel's failure to object to the prosecutor's special instruction and closing argument was deficient, Ali is unable to show that he was prejudiced as a result.

As previously discussed, use of the special manslaughter jury instruction in combination with the related portions of the prosecutor's closing argument did not violate Ali's due process rights.  The jurors had the correct definitions of the various levels of homicide as provided by the jury instructions, which they clearly spent time reviewing as suggested by their request for additional copies.  The trial court also gave an instruction, CALJIC 8.50, distinguishing murder from manslaughter, which reminded the jury that it was the State's burden to prove that the victim's death was not the result of heat of passion.  It gave an instruction, CALJIC 8.72, advising the jury not to convict Ali of murder if there was doubt whether the killing was murder or manslaughter.  Additionally, the jury was instructed pursuant to CALJIC 8.73, which provides that evidence of provocation could have a bearing on the existence of premeditation and deliberation.

Further, the first-degree murder verdict did not hinge solely on a determination that provocation was inadequate to negate malice aforethought.  The jury also needed to find that Ali acted willfully, deliberately and with premeditation pursuant to CALJIC 8.20, or killed during the commission of a robbery pursuant to CALJIC 8.21, none of which were affected or addressed by the special instruction.  See, e.g., People v. Thomas, 25 Cal. 2d 880, 899

United States District Court

For the Northern District of California

1
2
3
4

(Cal. 1945).  Because it is well-settled that "juries are presumed to follow their instructions," Zafiro v. United States, 506 U.S. 534 (1993), even if defense counsel had objected to the instruction and had been successful in his objections, it is not reasonably likely that the result would have been different.

5
6
7
8
9
10
11
12

Turning to the prosecutor's use of the "changing lanes" metaphor, even if defense counsel had successfully objected to the prosecutor's metaphor, it is not reasonably likely the result would have different.  Contrary to Ali's interpretation, the metaphor did not conflate intent to kill with the elements of premeditation and deliberation.  At best, the metaphor may have oversimplified the definition of deliberation while emphasizing that no particular amount of time is required to establish premeditation and deliberation, which constituted a correct statement of California law.  See Thomas, 25 Cal.2d at 900 ("The true test is not the duration of time as much as it is the extent of the reflection.").

13
14
15
16
17
18
19
20
21
22

Again, the jurors were informed that any conflict between statements by counsel and the instructions should be resolved in favor of the instructions.  RT 348.  The instructions correctly defined the elements of first-degree murder, including premeditation and deliberation.  CALJIC 8.20 clearly indicated that intent to kill is not equivalent to premeditation and deliberation when committed under the heat of passion, and is not a sufficient basis for a verdict of first-degree murder.  The record demonstrates that the jury reviewed the instructions again during deliberations, thus suggesting it did not rely blindly on statements made during closing arguments.  The instructions were clear that the jury should not convict Ali of first-degree murder if it had doubts about whether the murder was first-degree or second degree.  See, e.g., CALJIC 8.71.

23
24

For these reasons, habeas relief on Ali's claim for ineffective assistance of counsel is denied as well.

25

**IV.    The Introduction of Propensity Evidence Against Ali Did Not Violate His Due Process Rights**

26
27
28

Ali also claims that the introduction of propensity evidence violated his due process and fair jury trial rights.  The trial court allowed the prosecution to call Daisy Chandra

("Chandra"), Ali's ex-girlfriend, and an investigating police officer to testify about Ali's prior aggravated kidnapping offense.  During her testimony, Chandra described two incidents of kidnapping by Ali, including his physical violence and threats to kill her.  She testified that his violence was in response to her ending her relationship with Ali.  The trial court admitted the evidence to show intent, as part of the prosecution's theory that Ali reacted violently to rejection from women.

Ali argues that there was no rational basis for admitting propensity evidence in a case such as this one, which he asserts involves domestic violence, because consent was not a defense.  Therefore, Ali claims that he was prejudiced by the introduction of evidence of his prior domestic violence offenses.  Nevertheless, Ali concedes that the Ninth Circuit recently held in Alberni v. McDaniel that a state appellate decision concluding that the admission of propensity evidence does not violate due process was not objectively unreasonable.  458 F.3d 860, 866 (9th Cir. 2006).

The California Court of Appeal concluded that the propensity evidence regarding Ali's previous misconduct was properly admitted under California Evidence Code sections 1101 and 1109, and did not violate his due process rights.[14]  Further, it found that the trial court did not abuse its discretion under California Evidence Code section 352, which permits the trial court to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time, or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.  In holding that the trial court did not abuse its discretion, the appellate court determined that the trial court's ruling on the prejudice issue reflected careful and sound balancing of the probative value of the evidence.

Additionally, the appellate court concluded that the Chandra evidence was relevant to Ali's premeditation and deliberation, as well as to his intent.  It found that the Chandra

---

[14] California Evidence Code § 1101 permits the admission of evidence of prior criminality to prove some fact (i.e. motive, intent, etc.) other than disposition to commit such an act.  California Evidence Code § 1109(a) permits the admission of prior acts of domestic violence so long as they are permitted by California Evidence Code § 352.

United States District Court

For the Northern District of California

evidence was highly probative given other evidence suggesting that Biletnikoff intended to end her relationship with Ali, and may have done so shortly before her death. It reasoned that if Ali responded violently to rejection by women, the Chandra evidence was relevant in determining whether his violent response to Biletnikoff was deliberate, as well as to Ali's intent.

The appellate court's decision was reasonable given Ninth Circuit authority on this issue. In <u>Alberni</u>, the defendant/petitioner was charged with murdering his friend. 458 F.3d at 862. At his trial, the prosecution submitted evidence of the petitioner's past violent actions and explosive temper to challenge the defense's theory that the shooting was accidental. <u>Id.</u> at 863. The petitioner argued that the admission of the propensity evidence violated his due process rights. <u>Id.</u> The Ninth Circuit held to the contrary. <u>Id.</u> at 866.

Given the Ninth Circuit's recent decision in <u>Alberni</u>, the court concludes that the California Court of Appeal's decision upholding admission of the Chandra evidence was reasonable. Habeas relief on this claim is denied.

**V.    The Propensity Evidence Instruction Did Not Unlawfully Lessen the Prosecution's Burden of Proof**

Ali contends that the 1999 version of CALJIC No. 2.50.02, the instruction regarding propensity evidence, as given by the trial court, violated his due process rights by permitting the jury to find him guilty by a preponderance of the evidence, as opposed to beyond a reasonable doubt. The relevant portion of that instruction provides:

> Evidence has been introduced for the purpose of showing that the defendant engaged in an offense involving domestic violence on one or more occasions other than that charged in the case.
>            . . . .
>
> If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit other offenses involving domestic violence. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused.
>
> In addition, this evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character. It may also be considered by you for the purpose of determining if it tends to show the existence of intent which is a necessary element of the crime charged or a

United States District Court

For the Northern District of California

motive for the commission of the crime charged.

However, if you find by a preponderance of evidence that the defendant committed a prior offense involving domestic violence, it is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offense. The weight and significance, if any, are for you to decide.

For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purpose.

The jury was also instructed pursuant to CALJIC 2.50.2, the instruction defining preponderance of evidence, which states:

"Preponderance of the evidence" means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find the evidence on any side of an issue preponderates, your finding on that issue must be against the party who has the burden of bringing it. You should consider all the evidence bearing on any issue regardless of who produced it.

The California Court of Appeal denied Ali's claim based on the California Supreme Court's decision in People v. Reliford, 29 Cal. 4th 1007, 1012-16 (Cal. 2003). In Reliford, the California Supreme Court held that the 1999 version of CALJIC 2.50.01, an analogous instruction, did not create a reasonable likelihood that the jury would apply the preponderance of evidence standard instead of the reasonable doubt standard, and therefore the instruction was constitutional.[15] Id. at 1016.

The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. In re Winship, 397 U.S. 358, 364 (1970). Faulty jury instructions justify habeas relief only if the instructions by themselves so infect the entire trial that the resulting conviction violates due process. Estelle, 502 U.S. at 72. The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The instructions must be

---

[15] The language in the contested instruction in the case at hand, CALJIC 2.50.02, and the contested instruction in Reliford, CALJIC 2.50.01 is nearly identical. Reliford, 29 Cal. 4th at 1011-12. The only significant difference is that the instruction in Reliford instructed the jury on propensity evidence for prior sex crimes, whereas the contested instruction in the present case deals with domestic violence propensity evidence. Id.

40

United States District Court

For the Northern District of California

more than erroneous; Ali must show a reasonable likelihood that in light of the instructions as a whole, the jury applied the challenged instructions in a way which violated his due process rights.  Id.

Ali contends that the 1999 version of CALJIC 2.50.02, as provided at trial, violated his due process rights because the court did not sufficiently instruct the jury that the lower standard of proof used to establish prior domestic violence offenses did not apply to its determination regarding murder, a verdict that must be reached beyond a reasonable doubt.  However, Ali recognizes that this court has previously reviewed an analogous instruction, and followed the line of analysis utilized by the California Supreme Court, in concluding that the disputed instruction did not violate a petitioner's due process rights.  See Kagel v. Scribner, 2004 WL 1777381 (N.D. Cal., August 6, 2004).

Like the petitioner in Kagel, Ali has similarly failed to show that the state appellate court's determination regarding the jury instructions here was unreasonable.  The jury instructions as a whole mitigated any possible misinterpretation of the contested instruction.  The trial court instructed the jury pursuant to CALJIC 1.01 to consider the instructions as a whole.  The trial court also gave CALJIC 2.09, instructing the jury that certain evidence was only to be considered for a limited purpose.  The jury was also instructed that Ali must be presumed innocent unless proven guilty beyond a reasonable doubt pursuant to CALJIC 2.90, and the trial court defined reasonable doubt in accordance with CALJIC 2.90.

Moreover, the disputed instruction itself, CALJIC 2.50.02, specifically states that a finding that Ali had committed the previous offenses is not sufficient to prove beyond a reasonable doubt that he committed the charged offense.  Finally, the jury was instructed on the elements required to convict of the charged offense, and that proof of each element was required.   In light of the accompanying instructions, there was not a reasonable likelihood that the jury applied CALJIC 2.50.02 in such a way that Ali's due process rights were violated.  See Estelle, 502 U.S. at 72.  Accordingly, the California Court of Appeal's decision was not unreasonable, nor was it an unreasonable application of clearly established Supreme Court precedent.  For this reasons, this claim fails as well.

**VI.    Conditional Request for Evidentiary Hearing**

In his petition, Ali asserted a "conditional" request for an evidentiary hearing in the event that this court concludes that his petition should be denied.  The State opposes this request in its opposition, arguing that Ali has not shown diligence entitling him to a hearing or that the hearing would be useful to resolution of any of his federal habeas claims.  Ali failed to respond to the issue in his traverse.

AEDPA's section 2254(e)(2), governing evidentiary hearings, provides:

> If the applicant has failed to develop the factual basis of a claim in state court proceedings, the court shall not hold an evidentiary hearing unless the applicant shows that:
>
> (A) the claim relies on–
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; *and*
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The United States Supreme Court has interpreted the opening paragraph of the section to provide that where a petitioner has indeed exercised diligence to "develop the factual bases" of his claims in state court, the requirements of section 2254(e)(2)(A)& (B) do not apply to his request for an evidentiary hearing.  Williams v. Taylor, 529 U.S. 420, 435 (2000); Holland v. Jackson, 542 U.S. 649, 652-53 (2004).  In other words, a petitioner who has exercised such diligence will be taken out of the purview of section 2254(e)(2), or as the Ninth Circuit has sometimes termed it, subjected to the evidentiary standard in "pre-AEDPA" cases.  Griffey v. Williams, 345 F.3d 1058 (9th Cir. 2003), *vacated on other grounds as moot*, 349 F.3d 1157 (9th Cir.2003) (petitioner died); Williams, 529 U.S. at 430 (showing under 2254(e)(2) "applies only to prisoners who have 'failed to develop the factual basis of a claim in state court proceedings'").

Accordingly, "[a] petitioner who avoids the reach of § 2254(e)(2) qualifies for an

United States District Court

For the Northern District of California

evidentiary hearing if the petitioner alleges facts, that if proven, would entitle him to relief and the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts." Griffey, 345 F.3d at 1065 (citing Jones v. Wood, 114 F.3d 1002, 1010, 1013 (9th Cir. 1997)). "In other words, petitioner must allege a colorable constitutional claim." Turner v. Calderon, 281 F.3d 851, 890 (9th Cir. 2002). There is no "per se rule requiring an evidentiary hearing whenever a petitioner has made out a colorable claim, though." Id. "Rather, a petitioner must establish that his allegation. . ., if proven, would establish a constitutional deprivation." Id. "Entitlement to an evidentiary hearing based on alleged ineffective assistance, for example, requires a showing that if [petitioner's] allegations were proven at the evidentiary hearing, deficient performance and prejudice would be established." Id. Where a petitioner is unable to make the showing of diligence required, he will be subjected to the more stringent standards contained in section 2254(e)(2)(A) & (B). Williams, 529 U.S. at 435; Holland, 542 U.S. at 652.

The court has reviewed the record, and confirmed that Ali did not request an evidentiary hearing in either his appellate briefs on direct appeal or in his habeas petitions in the state appellate courts. Diligence "depends upon whether petitioner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005) (quoting Williams, 529 U.S. at 435). "Diligence requires in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." Williams, 529 U.S. at 435. The Ninth Circuit has held that where a petitioner brought his claims only on direct review before the state appellate court, failed to request an evidentiary hearing there, and failed to file a state habeas petition as to those claims, that he "failed to develop the factual basis of his claim in state court proceedings." Bragg v. Galaza, 242 F.3d 1082, 1090 (9th Cir. 2001). "[Petitioner's] inactions show[ed] insufficient diligence to satisfy the standard set forth in Williams." Id. Because Ali cannot be said to have exercised diligence in developing the factual bases of these claims in state court, his request must be subjected to the more stringent standards of § 2254(e)(2).

43

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Turning to that section, Ali has not even articulated, much less demonstrated, that "new" evidence exists that could not have been previously discovered or raised in the state court proceedings through the exercise of due diligence.  See § 2254(e)(2)(A)(I). Permitting an evidentiary hearing on issues which could have been raised in the state court proceedings, but were not, would only serve to provide "an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." Williams, 529 U.S. at 437.   Nor is there a new rule of constitutional law which is made retroactive on collateral review in this case.  See § 2254(e)(2)(A)(ii).

Alternatively, even if Ali had requested an evidentiary hearing before the state courts, thus exercising diligence in fully developing his claims, it is not clear to the court "what more an evidentiary hearing might reveal of material import."  See Gandarela v. Johnson, 286 F.3d 1080, 1087 (9th Cir. 2002) (denying petitioner's request for evidentiary hearing regarding his assertion of actual innocence).  Because Ali's claims may be resolved by reference to the state court record and the documentary evidence he has submitted, the court denies his conditional request for an evidentiary hearing.  See Griffey, 345 F.3d at 1067 (even where petitioner had shown diligence entitling him to evidentiary hearing, Ninth Circuit concluded that petitioner was not entitled to evidentiary hearing because his claims could be resolved by reference to the state court record and the documentary evidence he submitted); see also Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994).

### CONCLUSION

For the reasons set forth above, Ali's petition for a writ of habeas corpus is DENIED. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: August 24, 2007

_____
PHYLLIS J. HAMILTON
United States District Judge

44